### WEST BLOOMFIELD COMPANY *v.* HADDOCK.

1. RECORDS—PLATS—STATUTES.
   The failure to record a plat of 8 lots located between a high-
   way and a lake and deeds of which lots described the land
   by metes and bounds was not a violation of sections of the
   plat act requiring a proprietor of land to record his plat of
   land under certain circumstances (CL 1948, §§ 560.2, 560.2a).

2. COVENANTS—RECIPROCAL NEGATIVE EASEMENTS—USE OF LANDS
   OUTSIDE OF PLAT.
   The use being made of property adjacent to, but outside of,
   unrecorded plat in which uniform restrictions appear in all
   deeds to grantors of the 8 lots therein are not controlling
   of rights of litigants involving enforcement of restrictions
   imposed by deed upon the grantees therein.

3. SAME—BUILDING  RESTRICTIONS—RESIDENCE—MEDICAL  CLINIC—
   MERGER OF AGREEMENTS.
   In suit by corporate proprietor and owners of adjacent lots in
   unrecorded plat to enjoin defendant doctor and his wife
   from erecting a building with 17 rooms, corridor, and 3-car
   garage on first floor for use as a medical clinic and 10 rooms
   on second floor for living quarters, where testimony was in

<hr />

REFERENCES FOR POINTS IN HEADNOTES
[3]  55 Am Jur, Vendor and Purchaser, § 98.
[4–7, 9]  14 Am Jur, Covenants, Conditions and Restrictions, §§ 217,
      239.
[4–7, 9]  Construction and application of covenant restricting use
      of property to "residence" or "residential purposes."   175 ALR
      1191.
[6]  14 Am Jur, Covenants, Conditions and Restrictions, § 211.
[8]  14 Am Jur, Covenants, Conditions and Restrictions, § 206.
[9]  14 Am Jur, Covenants, Conditions and Restrictions, § 337 *et seq.*

conflict as to whether contemplated use by defendants previous to purchase was stated to plaintiff proprietor's president, finding of trial judge that such a use as proposed building indicated was not outlined by defendants and that any talk on the subject was merged in the sales agreement referring to the restrictions of the plat *held*, supported by the record.

4. SAME—BUILDING RESTRICTIONS—RESIDENCE.

Restrictions in deed of lot in unrecorded plat that purpose of restrictions was to insure use of property for attractive residential purposes, that no buildings could be erected thereon except as allowed by the restriction, *viz.*, only one residence and appurtenant garage, confined the structures to a single residence and appurtenant garage.

5. SAME—BUILDING RESTRICTIONS—PRACTICE OF MEDICINE—MEDICAL CLINIC.

Under restrictions in deed of lot in unrecorded plat clearly limiting use of buildings on lot to a single residence and appurtenant garage but also reciting that it was not to be construed "as preventing the practice of medicine," as part of clause barring use of premises for "manufacturing or commercial enterprise or enterprise of any kind for profit," a consideration of the restrictions as a whole requires the limitation on the practice of medicine in the residence only incidentally to the use of the residence as a residence and would not permit the use for a 17-room clinic in addition to 10 rooms for living quarters, it being necessary that the residential use be the predominant use.

6. SAME—BUILDING RESTRICTIONS—CONSTRUCTION AS A WHOLE—GENERAL PLAN.

Building restrictions should be read as a whole, where there is any doubt about their meaning, and construed in the light of the general plan under which the restrictive district was platted and developed.

7. SAME—BUILDING RESTRICTIONS—MEDICAL CLINIC AND RESIDENCE—FINDINGS—EVIDENCE.

Finding of trial judge that proposed structure containing 17 rooms for medical clinic and 3-car garage on first floor and 10 rooms for living quarters on second floor was violative of building restrictions imposed in deed of lot in unrecorded plat *held*, supported by record, when restrictions are read as a whole.

8. SAME — PLATS — RESERVED RIGHT TO DISAPPROVE PLANS — DUE PROCESS.

Plat proprietor's reservation of right of disapproval of plans for structure to be erected on a lot therein is valid and does not constitute an unlawful taking of the grantees' property without due process of law but such right must be exercised in a fair and reasonable manner and disapproval was proper notwithstanding structure was of an attractive design, where proposed use included dominant use for business purpose in plat restricted to use for single residences.

9. APPEAL AND ERROR—INJUNCTION—BUILDING—APPROVAL OF PLANS —TIME—REMOVAL OF UNCOMPLETED STRUCTURE.

Where construction of proposed combination medical clinic and residence was halted by injunction and defendants required to submit and receive approval of plans for residence and have space only sufficient for one doctor to practice medicine incident to use of premises for residence within 90 days or remove the partly completed structure in accordance with pertinent restriction as to completion of buildings, cause is remanded for modification as to time within which further action may be taken.

Appeal from Oakland; Holland (H. Russel), J. Submitted October 14, 1949. (Docket No. 68, Calendar No. 44,562.) Decided January 9, 1950.

Bill by West Bloomfield Company, a Michigan corporation, and others against Douglass A. Haddock and wife to restrain erection of a building. Decree for plaintiffs. Defendants appeal. Affirmed and remanded.

*Patterson & Patterson,* for plaintiffs.

*J. A. Tillson* (*William A. Ewart,* of counsel), for defendants.

NORTH, J. In this injunction suit the defendants were enjoined from erecting a proposed structure on a parcel of land hereinafter described. From the decree entered the defendants, Dr. Douglass A. Had-

dock and his wife, Maude R. Haddock, have appealed. In general the controversy centers around defendants' right to continue the construction of a building of which a part is residential and the balance is designed as and for a complete and rather extensive clinic which the doctor proposes to maintain and operate in connection with his practice as a medical doctor.

Plaintiff West Bloomfield Company, a Michigan corporation, was the owner of substantial acreage located in the general vicinity of Upper Straits lake in West Bloomfield township, Oakland county. A portion of this acreage bordering on the lake was surveyed and platted into 8 lots designed for highly restricted residential purposes, known and described as Wildwood Shores. The plat of these 8 lots was not recorded; but we are not in accord with defendants' contention that failure to record a plat of the 8 Wildwood Shores lots was a violation of the statute (CL 1948, §§ 560.2, 560.2a [Stat Ann 1949 Cum Supp §§ 26.432, 26.432(1)]). Identical "general restrictions" as those in defendants' deed, which is by metes and bounds, were embodied in each of the deeds of the other 7 lots when deeded by the corporation to the respective purchasers. In September, 1943, defendants purchased from the corporation the most westerly of the 8 lots. In the record and herein this lot is designated as parcel A. The next lot to the east, referred to as parcel B, is owned and occupied by plaintiffs Underhill. Next east of parcel B is parcel C, which is owned and occupied by plaintiffs Mowrey. The 8 lots are each large and quite comparable in area. Each is bounded on the south by Walled Lake road and on the north by Upper Straits lake. Defendants' parcel A is approximately 300 feet in width with a north and south length of somewhat in excess of 700 feet. The corporation never owned the property next west of

defendants' lot, and obviously this adjoining property is not restricted in any way by the "general restrictions" contained in the deeds conveying the 8 lots in Wildwood Shores. On this property adjoining defendants' lot on the west there is a boat livery and public picnic grounds. But the use being made of that property is in no way controlling of the rights of these litigants as to the use of the restricted property in Wildwood Shores.

We quote only in part from the restriction provisions contained in defendants' deed:

### "General Restrictions

"The purpose of these restrictions is to insure the use of the property for attractive residential purposes only, to prevent nuisances, to prevent the impairment of the attractiveness of the property, to maintain the desired tone of the community, and thereby to secure to each siteowner the full benefit and enjoyment of his home, with no greater restriction upon the free and undisturbed use of his site than is necessary to insure the same advantages to the other siteowners. Anything tending to detract from the attractiveness and value of the property for residence purposes will not be permitted.

"No manufacturing or commercial enterprise or enterprise of any kind for profit shall be maintained upon, in front of, or in connection with the site hereby conveyed, nor shall said site in any way be used for other than strictly residential purposes. This shall not be construed, however, as preventing the practice of medicine.   *   *   *

"No buildings shall be erected or placed upon said site except as allowed by this restriction, *viz:* only one residence and appurtenant garage will be allowed on said site (unless two residences are permitted thereon by the group restrictions, and then only as permitted by said group restrictions) together with such other buildings as may be necessary or desirable, and in determining what buildings

are necessary or desirable, the judgment of the grantors shall control.  *  *  *  The residence shall cost not less than the amount specified in the group restrictions, and shall conform in all other respects to the requirements of said group restrictions, as well as of these general restrictions.  *  *  *

"No bill-boards, sign boards (except suitable signs for sale of site) or unsightly objects of any kind shall be maintained on said site."

Dr. Haddock testified that the contemplated building would cost in the neighborhood of $65,000. Its general character or type is fairly disclosed by the following quoted from the opinion of the trial judge:

"The plans  *  *  *  show the proposed structure to be a building part one story and part two story. *  *  *  The two-story part on the ground floor shows facilities for the practice of medicine and surgery, containing a reception room, an office, a corridor and from off the corridor 2 consultation rooms, 4 treatment rooms, an operating room, a recovery room, a laboratory and drug room, 3 toilet rooms, an outside entrance marked 'Ambulance Entrance,' a laundry room, pantry and a 3-car garage. On the second floor of the 2-story part of the proposed structure the plans show a living room, dining room, kitchen, 2 bathrooms and 5 bedrooms. When the plans were submitted, they had written on them in red ink 'deleted from plan,' all the single story part of the plans, *and the testimony show that the defendants on the date of trial contemplated building only the two-story structure consisting as above stated of the facilities for the practice of medicine and surgery on the ground floor and the living quarters on the second floor, including the 3-car garage.* The plans designate the plans as follows: 'Medical Clinic and Residence for Dr. Douglass A. Haddock.' "

There is very little conflict in the testimony. The most material conflict pertains to testimony of Dr.

Haddock (and like testimony of Mrs. Haddock) which we quote:

"Mr. Ward (before the purchase) asked us what disposition or use we intended to make of that property and I replied that for the present we didn't intend to do anything with it but some years hence we intended to build a much larger office and residence combined and for some reason or other I turned to him, I said, 'There wouldn't be any objection to that, Mr. Ward?'. 'Oh, no, indeed,' he said, 'There is a clause right in your deed that says you can practice medicine,' that is all that was said."

The above testimony was specifically denied by Mr. Ward, president of plaintiff company. In part he testified:

"*Q.* Did he (Dr. Haddock) at any time give you to understand in any way that he contemplated practicing medicine on this site, that he was buying?

"*A.* No, he didn't, he already had his clinic where it was. * * * He said he wanted to have a larger home than he had at present and would like to have some more ground for that."

Under the record we are disposed to be in accord with the finding of the trial judge incident to this conflicting testimony. In his opinion the judge said:

"It is certain from the proof that the defendants did not outline or indicate to said Ward that they proposed to use the property in any such way as is contemplated by the present plans heretofore dealt with. Any talk on the subject was however merged in and limited by the language of * * * (the sales memorandum) to-wit: 'Received from Dr. Douglass A. Haddock deposit of $100 on the purchase of Parcel A, Wildwood Shores, Village of Orchard Lake, *subject to Wildwood Shores restrictions,* at a price of $4,000.'"

Dr. Haddock has practiced his profession for 11 years at his present location. His residence and his separate office building are located approximately 200 feet west of parcel A here in suit. The doctor testified that he planned to carry on at his new building the same practice that he was carrying on at his present clinic. We quote from the doctor's testimony:

"I have developed quite a practice out there. I go by the name of Orchard Lake Clinic, Orchard Lake Clinic, doing business as Orchard Lake Clinic. I have an associate with me. His name is Dr. Keith Currier. He is practicing at the clinic with me. * * * Dr. Currier has a full time job there with me now. He practices in this building where I practice which is called the Orchard Lake Clinic. Dr. Currier and I have a very fine medical practice. The number of patients in a normal day that Dr. Currier and I see would be hard to say for this reason, there is such a variation, there is a tremendous variation, but the number we have seen so far this year up to last night (11 months) is 1,393. * * * I discontinued obstetrics at the clinic during the last year of the war, around Christmas, 1945. We take them all to the hospitals now."

The doctor also testified that the plan of the proposed new building did not provide facilities for major surgery. Concerning the proposed building itself he testified:

"I say this building does not have any institutional characteristics, other than an office for practicing medicine. I haven't even anything on the outside that would indicate there is any office on the inside."

The crux of the litigation is: Should defendants be allowed under the circumstances of this case to construct on parcel A the proposed structure with the avowed purpose of its being used in the manner above indicated? We think not. Decision herein

requires placing a fair and reasonable construction upon the words "the practice of medicine" as used in the context of the general restrictions. At the very outset of the general restrictions it is plainly provided:

"The purpose of these restrictions is to insure the use of the property for attractive residential purposes only. * * * Anything tending to detract from the attractiveness and value of the property for residence purposes will not be permitted. * * * No buildings shall be erected or placed upon said site except as allowed by this restriction, *viz:* only one residence and appurtenant garage will be allowed on said site."

Clearly the restrictions just above quoted confine the structures on each of these lots in Wildwood Shores to a single residence and appurtenant garage. See *Kingston* v. *Busch,* 176 Mich 566, and *Killian* v. *Goodman,* 229 Mich 393. In the latter case the headnote reads:

"The words 'a dwelling house' and 'a residence,' as variously used in the deeds to describe the restrictions on the lots in a certain plat, construed, and *held,* to mean one single dwelling or one single residence, and therefore restricted the use of the premises to single residences or dwellings."

The plans and specifications of the proposed structure labeled "Medical Clinic and Residence for Dr. Douglass A. Haddock," were put in evidence. A disinterested realtor of 25 years' experience testified that any use of defendants' proposed structure other than as a single residence purpose would harmfully affect the value of other property in Wildwood Shores. He further testified concerning the proposed structure: "It does look like an institution of some sort. * * * I never saw a single private residence building like that with that elevation in my

life." In reviewing this record we have not overlooked the testimony of Dr. Frank Mercer, who, as a witness for defendants, upon being asked whether or not the "plans pertaining to his (Dr. Haddock's) facilities  *  *  *  would be *necessary* to practice medicine in a rural area," answered "I would say it would be a very convenient way of practicing medicine."

The sole provision in defendants' deed upon which they rely in asserting their alleged right to construct a building in which to conduct a clinic is: "This shall not be construed, however, as preventing the practice of medicine." The quoted words are a part of the second paragraph of the general restrictions hereinbefore quoted. This paragraph prohibits use of the premises for "manufacturing or commercial enterprise or enterprise of any kind for profit,  *  *  *  nor shall said site in any way be used for other than strictly residential purposes." Then immediately follows the qualifying words just above quoted as to the practice of medicine. If the restrictions are considered as a whole we think it quite conclusively appears that "the practice of medicine" as the words are used in the restrictions, means only the practice of medicine in the limited respect in which such practice is quite ordinarily carried on by physicians in their residences, notwithstanding they maintain separate offices where their general practice is carried on. We are in accord with the circuit judge who held: "The clear intent of the language used is that a doctor may practice medicine in his residence so long as it was *incidental to his use of his residence as a residence."* It would be an extreme construction to hold that the words "the practice of medicine" as here used include the right to erect a building in which to operate a clinic on such scale as is proposed by defendants herein. Surely such a construction would be

violative of the rule of law that in construing restrictions of this character where there is some doubt about the true meaning, such restrictions should be read and construed as a whole. In *Holderness* v. *Central States Finance Corp.*, 241 Mich 604, a headnote reads:

"Building restrictions should be read as a whole, where there is any doubt about their meaning, and construed in the light of the general plan under which the restrictive district was platted and developed."

Our review of this record brings the conclusion that the proof as a whole clearly sustains the finding of the trial judge, who in his opinion said:

"Under the restrictions    *    *    *    imposed upon 'site A' only 'one residence' can be erected 'upon said site and must be used strictly for residential purposes.' The foregoing is modified to the following extent: 'This shall not be construed, however, as preventing the practice of medicine.' This language simply means that a doctor can build a *single residence* and *practice medicine in and therefrom.* Nowhere in the restrictions is to be found language which suggests that a doctor under the guise of building a *single residence can build an elaborate, spacious* or glorified medical office, clinic or what not, simply by appending thereto living quarters, all of which is precisely what is being here attempted. The language which permits the *practice of medicine in a single residence does not permit the building of a* clinic or a medical office, even though living quarters are attached or located upstairs. The proposed building will not be a single residence either as to structure or use. It will be an institution. The *residential* use must be the *predominant use,* not the use as a place to practice medicine. The proofs in this case demonstrate beyond question that the proposed building of the defendants when completed would be a modern elaborate medical clinic with in-

cidental living quarters above and *not a residence.*
\* \* \*

"The proposed structure and the use planned by defendants is a breach of the restrictions both in letter and spirit. The testimony shows that the structure is built for the prime purpose of enabling the carrying on of business. Rather than having the character of a residence it has the character of a business place with living quarters above. The structure is planned to house the only business that Dr. Haddock has, that Dr. Currier has, and it is in no sense, nor will it be a residence wherein a doctor would be practicing his profession from a single residence."

The general restrictions also contain the following :

"All buildings, fences and other structures erected or placed upon said site shall be of attractive design, and before any work upon any such building, fence or structure is commenced, the design thereof shall be submitted to, and approved in writing by the grantors. The grantee shall also, before any work is commenced on any building or structure on said site, deposit with the grantors a set of blueprints showing the design and plans thereof and a copy of the specifications therefor, as approved by the grantors, to be retained by the grantors until such building or structure has been completed in accordance therewith."

We are not in accord with defendants' contention that the lawful exercise of the right of disapproval under this provision of the restriction constitutes an unlawful taking of defendants' property without due process of law. Provisions of the above character are valid. *Jones* v. *Northwest Real Estate Co.,* 149 Md 271 (131 A 446) ; *Harmon* v. *Burow,* 263 Pa 188 (106 A 310) ; *Parsons* v. *Duryea,* 261 Mass 314 (158 NE 761). We agree with defendants that as to a grantor who has reserved the right of approval :

"He must not act in a high-handed, whimsical or despotic manner. He is required to consider the facts and must be fair and reasonable in approving or rejecting the plans submitted." But we are not in accord with defendants' contention that: "In the present case the restrictive covenant has as its purpose 'to insure the use to (of) the property for attractive residential purposes only,'" as defendants have attempted to construe this provision in their brief. Defendants' contended construction seems to be that if the building is of "attractive design" in its exterior appearance, then it complies with the restruction requirements. Obviously this is not so. As held by the circuit judge, plaintiff corporation was within its rights when, in disapproving defendants' plans for the proposed structure, it advised them in part as follows:

"However desirable your project may be and however well suited your plans may be to its purpose, it does not come within the purview of the restrictions governing the properties which we have sold."

Because it is pertinent to a phase of the circuit court's decree about to be noted, we quote a further portion of the restrictions contained in defendants' deed:

"Said grantee further covenants that, should he at any time commence the erection of a building or other structure upon said site, he will press the work to completion within a reasonable time, or, failing in that, will remove the partially finished structure and not allow same to remain in an unfinished and unsightly condition for an unreasonable time; * * * and in case grantee shall fail to keep the above covenants, or either of them, and should such default continue for 60 days after grantors shall by writing notify the grantee of his violation of the provisions of this covenant and demand compliance therewith,

then and from thenceforth, that is to say, after the lapse of said 60 days, the unsightly condition of grantee's premises shall, as between parties hereto, their heirs, successors, representatives and assigns, and as between the grantee and the other site-owners, their heirs, representatives and assigns, constitute a 'nuisance' and shall be subject to all the remedies provided by the law for nuisances; the provisions of this covenant being intended to be in the nature of a further general restriction upon the use of the said site in line with the general purpose of maintaining an attractive residential community."

By the decree entered in the circuit court defendants were enjoined from proceeding with the construction of the proposed structure on parcel A and were required to submit and receive approval of plans for a single residence, "the use of said structure to be limited to single residence purposes only except that defendant, Douglass A. Haddock, shall have the right to engage in the practice of medicine incidental to his residence therein, using no more space in said residence for the practice of medicine than would be found in the usual single residence wherein one doctor practices the profession of medicine incidental to his residence therein." The decree further provides that if defendants fail to act as above decreed within 90 days after the date of the decree, they shall within an additional 90 days "remove the partly erected structure now on the premises," and if defendants default in so doing plaintiffs or any of them may remove the partially constructed building at defendants' expense. The decree permits defendants to "take temporary measures to preserve the present building" pending this appeal.

The decree is affirmed and the case remanded to the trial court with jurisdiction to modify its decree as to the time within which further action may be

taken in the manner decreed to such extent as shall be deemed proper by the trial court. Plaintiffs may have costs of both courts.

BOYLES, C. J., and REID, DETHMERS, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred.